# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT NORTH DAKOTA
# SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Chad Allen Seibel, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Ken Johnson, Pharmacist-NDSP | ) | Case No. 1:08-cv-069 |
| Kathy Bachmeier, Head of Nursing-NDSP | ) | |
| in their individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

___

Plaintiff Chad Allen Seibel is an inmate at the North Dakota State Penitentiary (NDSP). He initiated the above-entitled action on July 22, 2008, by lodging a complaint pursuant to 42 U.S.C. § 1983. Seibel is proceeding *pro se*. Defendants have filed a motion for summary judgement, and Chief Judge Hovland has referred the motion to the undersigned for preliminary consideration.

## I.     BACKGROUND

The following factual background is taken from Seibel's complaint:

> In June 2001 I was diagnosed with toxoplasmosis in my right eye. I was prescribed 5 medications that i was supposed to take continuously to prevent further damage to my eye. These medications were, pyrimethamine, sulfadiazine, clindamycin, prednisone, and leucovorin.
>
> At the time medications dispensed weekly on Tusdays by exchanging your used med-cards, from the previous week, for new cards at the med-line located next to the traffic desk at the North Dakota State Penitentiary (NDSP).
>
> On July 17, 2001 I went to the morning med-line with my empty med-cards to exchange for my new ones for the following prescriptions, pyrimethamine, sulfadiazine, clindamycin, and prednisone. The RN working was Colleen (last name unknown), I gave her my old cards but she couldn't find my new cards. Colleen then showed me on my old cards where they had expired, meaning the prescription had run out. I then explained that I'd seen the eye specialist, Dr. Max Johnson, the week

1

before and that he had renewed the prescriptions and told her how important it was that I continue taking these medications. She took down my name and told my [sic] to check back at the next med-line, which would have been at 12:30 p.m.

I returned at 12:30 p.m., 5:45 p.m., and 8:00 p.m. on the 17th and again went to all four med-lines on Wednesday the 18th. On Thursday the 19th I stopped at the Noon med-line to see if my leucovorin, which I took twice a week Mondays and Thursdays, was there, and it was. The nurse then also checked for the other medications but could find nothing. Ken Johnson the Pharmacist said the prescriptions were filled when I inquired about the whereabouts of my prescriptions. Knowing the importance of these medications for keeping my eyesight intact, and knowing that I did not receive 4 of the 5 prescribed medications, I believe it would not have been out of line for the pharmacist to fill an emergency med-card for the remainder of the week.

On July 27, 2001 I was stopped in the hallway by another RN at NDSP named Beth, she asked me why I hadn't been taking my medications. I then told her that when I had ben to the med-line the day before for my twice weekly leucovorin I had asked about my other medications, the nurse had checked, but they still couldn't find them. Beth walked with me up to the med-line and looked, she found the missing medications, I began taking them immediately as prescribed.

On August 9, 2001, before going to bed, I experienced trouble seeing out of my right eye. The following morning, the 10th, I could not see at all so I notified my Case Manager, Steve Bement, who called the infirmary and was told that they were unable to do anything until Kathy Bachmeier returned the following week.

On August 15, 2001 I saw Doctor Fitzpatrick who told me I had a detached retina due to the interruption of taking my medications, and was referred to a retinal specialist in Minnesota, Dr. Tim Olson, who I saw on August 21, 2001 for retinal surgery.

I continued seeing Dr. Max Johnson until November 15, 2002. Everything I was told by all the doctors I'd seen and the medical staff at NDSP indicated that my loss of sight was temporary.

After my last visit with Dr. Johnson I decided to file grievances about the ongoing situation because I'd finally learned enough about my eyesight impairment to know that it wasn't going to get any better.

Finally, On July 8, 2004 I was told by Dr. Leidux, another specialist, that my eyesight was not going to get any better until there were advancements in stem-cell research, and there was nothing more that could be done.

>        This situation could have been avoided. By not acting and not realizing the importance of not interrupting the treatment of my toxoplasmosis, and the consequences of that interruption, the Defendants inflicted cruel and unusual punishment upon me in violation of the Eight Amendment of the United States Constitution by causing the detachment of my retina resulting in the loss of sight in my right eye.

(Doc. No. 6).

Defendants have submitted several affidavits in support of their motion for summary judgment. One is from defendant Johnson, who is the Pharmacist at the NDSP. (Doc. No. 23-4). Johnson states in his affidavit that he fills the prescriptions, but does not dispense them, which is a job that is handled by NDSP nursing staff. Johnson states it is possible he may have had a conversation with Seibel about his medications, but does not recall if he did or not. He does not believe, however, that Seibel made any specific request of him about his medications, given his practice of charting such requests and the absence of any mention of a request in Seibel's chart. Johnson states his office is readily accessible to inmates and that Seibel could have either personally visited him or made a written request ("kite" in prison parlance) if he needed replacement medicines. Johnson states that a new med card could have been issued and filled, since Seibel's medications were not abusable. Johnson states he did not become aware of the claim that Seibel had not received his medications in July 2001 until Seibel submitted a grievance some sixteen months later.

Defendant Kathleen Bachmeier was the Director of Medical Services for the NDSP in 2001 and is now the Director for the North Dakota Department of Corrections and Rehabilitation ("NDDOCR"), which includes the NDSP as well as other penal facilities. Bachmeier states in her affidavit that her job involves arranging for and coordinating medical services for inmates at the NDSP. (Doc. No. 23-3). She states she has never been personally involved in the distribution of the prescription medications, which is handled by others.

Bachmeier states she did not become aware of Seibel's allegations regarding his medications until January 2003 after Seibel submitted a grievance. She states that the nursing notes and physician orders and notes from July 17, 2001, through July 28, 2001, do not reveal any complaints by Seibel regarding his medications. In fact, the notes reveal that Seibel met with Dr. Ebel on July 25, 2001, for an unrelated issue and, while Seibel's toxoplasmosis was referenced as part of Seibel's history, there is no mention of Seibel complaining about not receiving his medications.

Bachmeier states it is possible she may have been absent from work or on leave when Seibel reported his vision problems, but she cannot confirm this since employee leave records are no longer available for the time period in question. She states that, if she was absent, her authority for arranging for medical care would have been delegated to another staff person during her absence.

Johnson and Bachmeier both describe in their affidavits the procedure that was employed at the NDSP for distribution of medications in 2001. Non-abusable medications, including the ones being taken by Seibel, were dispensed on a weekly basis using a medication card, which would contain the prisoner's medications for the entire week in a matrix sorted by day and the time of day, *i.e.*, morning, noon, evening, and bedtime. The responsibility for taking the medications rested with the prisoner. Bachmeier states that this procedure has worked well and she does not recall a with a prisoner not receiving necessary medications, either before or after Seibel's claim. Bachmeier states the same procedure is used today for dispensing non-abusable medication, except that now these medications are dispensed monthly instead of weekly.[1]

Bachmeier states that, if Seibel had a problem with his medications, there were several ways it could have been addressed. Seibel could have told anyone of several prison staff about the

---

[1] No claim is made by Seibel that he was not competent to take his own medications.

problem, including the nurses in the medication-distribution room, the pharmacy, Bachmeier herself, NDSP security, or his case manager. Seibel could also have sent a kite to any of the same persons. Finally, Seibel could also have filed a timely grievance. The affidavits filed by the defendants state that there is no record of Seibel taking any of these actions, except for the grievance he filed some sixteen months later.

Seibel filed a Step 1 grievance regarding the July 2001 medication problems in November 2002, which was received on November 22, 2002, and responded to on November 25, 2002. A Step 2 grievance, signed December 2, 2002, was filed on December 3, 2002. The Step 2 grievance received a response on December 5, 2002. Seibel appealed the denial of his Step 2 grievance to the Director of the Department of Corrections and Rehabilitation (DOCR). The appeal was denied by letter dated January 21, 2003. And, as will be discussed below, the denial of the grievance ws on the merits. (Doc. No. 23-4, Exs. 2-5).

Another Step 1 grievance referencing the July 2001 medication issue was filed on January 30, 2003. The response is undated. No Step 2 grievance was filed. (Doc. No. 23-3).

The grievances filed by Seibel did not address the alleged failure to provide prompt medical treatment once his retina had become detached.

## II.  STANDARD OF REVIEW

The following well-established principles govern the court's consideration of the defendant's motion for summary judgment:

> Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Such a showing shifts to the non-movant the burden to go beyond the pleadings and present

      affirmative evidence showing that a genuine issue of material fact exists. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Ind. Co.</u>, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d (1986). The non-movant "must show there is sufficient evidence to support a jury verdict in [her] favor." <u>Nat'l Bank of Commerce v. Dow Chem. Co.</u>, 165 F.3d 602, 607 (8th Cir.1999). "Factual disputes that are irrelevant or unnecessary will not be counted," <u>Anderson</u>, 477 U.S. at 248, 106 S.Ct. 2505, and a mere scintilla of evidence supporting the nonmovant's position will not fulfill the non-movant's burden, <u>id</u>. at 252, 106 S.Ct. 2505.

<u>Uhiren v. Bristol-Meyers Squibb Company, Inc.</u>, 346 F.3d 824, 827 (8th Cir. 2003).

### III.   DISCUSSION

      To succeed on his claim pursuant to 42 U.S.C. Section 1983, Seibel must prove (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the violation was committed by a person acting under color of state law. <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988).

      In this case, Seibel is claiming that his Eighth Amendment rights were violated by two separate failures to act. The first is the alleged failure on the part of prison officials to insure that he received the necessary medications for his right-eye condition on a timely basis, which he claims resulted in the detachment of his retina and loss of vision in his right eye. The second is the alleged delay in treating the detached retina.[2] Seibel claims that, if the retina had been surgically reattached within 24-48 hours, there was a good chance the sight in his right eye could have returned to its pre-attached vision.

---

[2] While Seibel's complaint mentioned the delay in treatment, it was not clear he was claiming it contributed to the permanent loss of vision in his right eye, as opposed to merely being additional evidence of his claimed lack of appropriate care. In his response to the motion for summary judgment, however, Seibel made clear his contention that the delay in treatment was an additional causative factor in the permanent loss of sight in his right eye. Of the two claims, this is the most troublesome in terms of a possible violation of the Eighth Amendment - assuming it has medical merit. But, for reasons discussed *infra*, this claim was not properly exhausted.

Defendants Johnson and Bachmeier are being sued in both their individual and official capacities. As discussed later, the suit against them in their official capacities is a claim against the State of North Dakota, since both are state employees.

### A.     Exhaustion of Administrative Remedies

The Prison Litigation Reform Act, at 42 U.S.C. § 1997e(a), provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong," Porter v. Nussle, 534 U.S. 516, 532 (2002), even when the prisoner seeks relief that is not available through the prison administrative process, such as money damages, Booth v. Churner, 532 U.S. 731 (2001). Further, §1997e(a) requires "proper exhaustion," meaning that the prisoner must fully exhaust the prison remedies that are available, including complying with the administrative deadlines and other critical procedural rules, or face the possibility of the loss of the claim for procedural default. Woodford v. Ngo, 548 U.S. 81, 87-103 (2006). Finally, the exhaustion requirement is an affirmative defense that must be pled and proved by the defendant. Jones v. Bock, 549 U.S. 199, 211-217 (2007).

In this case, Seibel filed a grievance complaining about the failure to provide him with his medications and pursued the grievance through all of the steps required by the NDSP's grievance policy, including a final appeal to the Director of the NDDOCR. Defendants argue this was not *proper* exhaustion, however, because the grievance was untimely, *i.e.*, it was submitted some sixteen months after the events in question when, by prison policy, it should have been submitted within fifteen days. The problem with this argument, however, is that NDSP officials, while they expressed the difficulty in responding to the grievance because of the delay in time, never stated the grievance

was denied because it was late, even as an alternative basis for its denial. This is particularly clear from the letter dated January 31, 2003, from the Director of the NDDOCR, who was the last and highest official to address the claim. (Doc. No. 23-4, Ex. 5).

When prison officials have considered an administrative claim on the merits and not relied upon procedural default as one of the grounds for its denial, the claim has been exhausted, since there is nothing left to decide, and they are foreclosed from arguing to this court procedural default as a defense. E.g., Vandiver v. Correctional Medical Services, Inc., 2009 WL 1175153, at *5 (6th Cir. 2009) (unpublished); McCarter v. California Dept. of Corrections and Rehabilitation, 2009 WL 2049359, at *8 (C.D. Cal. July 6, 2009); Bradley v. Williams, 2009 WL 198014, at *2 (D. Or. Jan. 23, 2009); Grear v. Gelabert, 2008 WL 474098, at *2, 8 (W.D. Mich. Feb. 15, 2008). Consequently, defendants' failure-to-exhaust defense fails with respect to Seibel's claim of deliberate indifference premised upon the alleged failure to insure that he received his medications on a timely basis.

The situation is different, however, with respect to Seibel's second claim of deliberate indifference relating to the alleged delay in treatment after his retina became detached. The grievance that Seibel filed never addressed this claim. (Doc. No. 23-4, Ex. 3). Consequently, under the authority cited earlier, this claim must be dismissed for failure to exhaust available prison remedies.[3] And, for reasons discussed in Wheeler v. Schuetzle, 2009 WL 1974312, *4 (D.N.D. July

---

[3] When a prisoner has failed to exhaust administrative remedies, the court is not permitted to consider the merits of the underlying claim and dismiss it on other grounds, except under limited circumstances. This is clear from the language of 42 U.S.C. § 1997e. The statute commands in subsection (a) that "[n]o action shall be brought . . . until such administrative remedies as are available are exhausted." The only exceptions are provided for in subsection (c)(2), which provides that, when the "claims is, on its face, frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief, the court may dismiss the underlying claim without first requiring the exhaustion of the administrative remedies." Fitzgerald v. Corrections Corp. of America, 403 F.3d 1134, 1139-40 & n.1 (10th Cir. 2005); see also Sharpe v. Costello, 289 Fed.Appx. 475, 478, 2008 WL 2736782, at *3 (3d Cir. 2008); Foulk v. Charrier, 262 F.3d 687, 696 (8th Cir. 2001) (quoting Perez v. Wisconsin Department of Corrections, 182 F.3d 532, 536 (7th Cir. 1999) ("The [PLRA exhaustion requirement] can function properly only if the judge resolves disputes about its application before turning to any other issue in suit.")).

8, 2009), with respect to the uncertainty as to the law in the Eighth Circuit, it is recommended that the dismissal be without prejudice.

### B. Statute of limitations

Defendants argued in their opening brief that Seibel's claims are barred by North Dakota's six-year statute of limitations set forth at N.D.C.C. § 28-01-16. In response, Seibel points to the tolling statute set forth at § 28-01-25, which, essentially, extends the period of limitations for up to five years for prisoners serving less than a life term. In Hardin v. Straub, 490 U.S. 536 (1998), the United States Supreme Court held that state tolling statutes similar to § 28-01-25 apply to federal civil rights claims pursuant to § 1983.

Noticeably absent from the defendants' reply brief is any disagreement as to the applicability of this tolling statute. In particular, there is no contention that Seibel is serving a life term, and the NDDOCR website states that Seibel's estimated release date is June 1, 2025. Consequently, defendants' statute-of-limitations defense fails.

### C. Lack of evidence of deliberate indifference

Liberally construing what Seibel has proffered in response to defendants' motion for summary judgment, including facts that technically have not been properly supported by way of affidavit, Seibel has failed to offer evidence sufficient to allow a reasonable jury to conclude that either of the two named defendants acted with deliberate indifference with respect to his claim that they failed to insure that he received the medications necessary for the condition in his right eye.[4]

In Jones v. Minnesota Department of Corrections, the Eighth Circuit summarized the rules

---

[4] The defendants cast their argument as one of the complaint failing to state claim under § 1983 for an Eighth Amendment violation, but rely extensively upon affidavits that go beyond the pleadings. The problem here is not one of the complaint failing to state a cause of action; the complaint is minimally sufficient in that regard. The problem is Seibel's failure to proffer sufficient evidence to take his failure-to-properly-dispense-medication claim to a jury, particularly given the evidence proffered by the defendants.

9

for determining what must be proved in order to establish deliberate indifference in this context, stating:

> "It is well established that the Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs." Gregoire v. Class, 236 F.3d 413, 417 (8th Cir.2000). In a deprivation of medical care case, the inmate must show (1) an objectively serious medical need; and (2) the defendants actually knew of the medical need but were deliberately indifferent to it. See Grayson v. Ross, 454 F.3d 802, 808-09 (8th Cir.2006).
> An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a "layperson would easily recognize the necessity for a doctor's attention." See Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir.1997), quoting Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir.1995). " 'To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk.' Rather, a plaintiff must demonstrate the official actually knew of the risk and deliberately disregarded it." Vaughn v. Greene County, Ark., 438 F.3d 845, 850 (8th Cir.2006), quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The determination that prison officials had actual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious. See Farmer, 511 U.S. at 842, 114 S.Ct. 1970. If prison officials have actual knowledge of a serious medical need, and fail to take reasonable measures to address it, they may held liable for deliberate indifference. See id. at 847, 114 S.Ct. 1970. "However, '[a] showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions." Pietrafeso v. Lawrence County, S.D., 452 F.3d 978, 983 (8th Cir.2006), quoting Gibson v. Weber, 433 F.3d 642, 646 (8th Cir.2006).

512 F.3d 478, 481-482 (8th Cir. 2008)

Seibel makes no claim that defendant Bachmeier was aware he had not received the medications for his right-eye condition - much less offer submissible proof of such knowledge, direct or circumstantial. In her affidavit, Bachmeier denies any such awareness, stating she was not personally involved in the dispensing of the medications. Further, the mere fact that Bachmeier may have had some supervisory authority over the other nurses is not alone sufficient to impose liability. See, e.g., Rowe v. Norris, 198 Fed.Appx. 579, 580, 2006 WL 2711945 (8th Cir. 2006) (unpublished

10

per curiam); Spann v. Roper, 453 F.3d 1007, 1009 (8th Cir. 2006) (per curiam); Meloy v. Bachmeier, 302 F.3d 845, 848-849 (8th Cir. 2002).

In short, Seibel has not proffered evidence sufficient for a jury to conclude that Bachmeier was deliberately indifferent with respect to the alleged failure to properly provide the medications for his right-eye condition. In fact, it appears the only reason that Bachmeier was named in this action was with respect to Seibel's failure-to-treat claim, for which he failed to exhaust his prison remedies. Consequently, Seibel's § 1983 claim against Bachmeier with respect to the alleged failure to properly dispense his medications should be dismissed with prejudice.

The same is also true for defendant Johnson. Taking what Seibel claims happened from both his complaint and his response to defendant's motion for summary judgment, Johnson's only alleged involvement was that he responded to inquiry from nursing staff about Seibel's medications by stating that the prescriptions had been filled. There is no suggestion that Seibel or the dispensing nurses requested Johnson to fill out another med card, much less that he refused. And, there is no evidence that Seibel or the nurses asked Johnson to investigate or take any other action.

This state of affairs is consistent with what Johnson claims happened. As noted earlier, Johnson states that his job was limited to filling the prescriptions and providing completed med cards to the nurses, who then dispensed the medication. Johnson states he was not made aware of the fact that Seibel was not getting his medication or that he needed a replacement med card.

Under these circumstances, any response by Johnson to the nurses that he had filled Seibel's prescriptions, even if mistaken, is not sufficient proof of deliberate indifference on Johnson's part.[5]

---

[5] Moreover, there is no credible evidence that Johnson was mistaken when he stated he had already filled Seibel's prescriptions. In fact, Seibel's own account of what happened suggests that the prescriptions had been filled and, at most, had been misplaced. Seibel has several times stated that a nurse later asked why he had not been taking his medications, and that, when he explained the circumstances, the nurse went and, in Seibel's words, "found my missing medication." (Doc. Nos. 6, p. 5a; 23-3, ex. 1; 26, p. 2).

11

As noted earlier, negligence, or even gross negligence, is not sufficient to establish deliberate indifference.

Seibel also appears to argue that Johnson should have done something more in terms of monitoring the situation and insuring he received his medications. Seibel has failed to come forward with sufficient facts, however, indicating this was Johnson's responsibility, and the evidence proffered by the defendants is that it was not.

Consequently, it is recommended that the § 1983 claim against Johnson be dismissed with prejudice.[6]

### D.  Official capacity claims

A lawsuit against a state employee in his or her official capacity is the same as suing the state, which has immunity under the Eleventh Amendment for any claims for damages in an action brought pursuant to 42 U.S.C. § 1983. See Quern v. Jordan, 440 U.S. 332 (1979); Edelman v. Jordan, 415 U.S. 651 (1974); Monroe v. Arkansas State University, 495 F.3d 591, 594 (8th Cir. 2007); Alsbrook v. City of Maumelle, 184 F.3d 999, 1010 (8th Cir. 1999); see also Kentucky v. Graham, 473 U.S. 159, 166-167 (1985) (discussing distinctions between individual and official capacity claims). In addition, states and their agencies are not "persons" within the meaning of § 1983 and are not proper parties for this reason as well. Will v. Michigan Dept. of State Police, 491 U.S. 58, 64 & 70 (1989); Alsbrook v. City of Maumelle, 184 F.3d at 1010.

---

[6] Given the conclusion that neither defendant violated Seibel's Eighth Amendment rights, the court need not consider further the defendants' arguments for qualified immunity. Cavataio v. City of Bella Villa, __ F.3d __, 2009 WL 1905439, at *4 n.4 (8th Cir. 2009).

In this case, Johnson and Bachmeier are state employees. As a result, Seibel's monetary claims against them in their official capacities must be dismissed, even putting aside the failure of one claim on the merits and the failure to exhaust prison remedies with respect to the other.[7]

## IV. RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that defendants' motion for summary judgement (Doc. No. 22) be **GRANTED** as follows:

1.  That Seibel's Eighth Amendment claim against the defendants premised upon an alleged failure to properly dispense medications be **DISMISSED WITH PREJUDICE**.

2.  That Seibel's Eighth Amendment claim against the defendants premised upon the alleged failure to promptly treat his detached retina be **DISMISSED WITHOUT PREJUDICE** for failure to have exhausted available prison remedies.

---

[7] State officials are subject, however, to suit under § 1983 in their official capacities for prospective relief. Will v. Michigan Dept. of State Police, 491 U.S. at 71 n. 14; Ex parte Young, 209 U.S. 123, 159-60 (1908); Murphy v. State of Arkansas, 127 F.3d at 754. In this case, Seibel asks that the Johnson and Bachmeier be barred from working for the State of North Dakota in any medical capacity. Even if Seibel had a viable claim of deliberate indifference, it is unlikely that such drastic relief would be justified. See Sterling v. Calvin, 874 F.2d 571, 572 (8th Cir. 1989) (in order to obtain injunctive relief there must be some showing of a substantial likelihood that past unlawful conduct will recur); Reeves Bros., Inc. v. United States Environmental Protection Agency, 956 F. Supp. 676, 679 (W.D. Va. 1996) (holding that the one incident of unconstitutional conduct in that case was insufficient to establish "a realistic, cognizable danger of future harm.").

## **NOTICE OF RIGHT TO FILE OBJECTIONS**

Pursuant to D.N.D. Civ. L. R. 72.1(D)(3) any party may object to this recommendation within ten (10) days after being served with a copy of this Report and Recommendation. Failure to file appropriate objections may result in the recommended action being taken.

Dated this 22nd day of July, 2009.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge